J-A22032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SHAWN BLOUIR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRIS CLUTTER | : | |
| | : | |
| Appellant | : | No. 471 WDA 2022 |

Appeal from the Order Entered March 29, 2022
In the Court of Common Pleas of Greene County Civil Division at No(s):
AD 309-2020

BEFORE:   OLSON, J., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: OCTOBER 25, 2022**

Chris Cutter ("Mother") appeals from the final order awarding Shawn Blourir ("Father") shared legal and physical custody of the parties' only child, a daughter ("Child"), who was born in August 2013.  We affirm.

Father cohabitated with Mother, in Mother's home, beginning in 2003, and Child was born in 2013; Mother and Father never married.  As the trial court noted:

> Ultimately the relationship of the parties became so strained that Father left the [ ] home on May 21, 2020 with both parties clearly in favor of that move.  Leading up to that separation there were apparent significant arguments between the parties and name calling and disparaging remarks by both regarding the other often in front of [Child].  Father did admit that during the stress of the entire situation he even called the child negative names.

---

[*] Retired Senior Judge assigned to the Superior Court.

The relationship of the parties was more difficult because we accept Father's testimony that essentially Mother was obsessed with germs and created various rituals that Father and [C]hild were required to follow.[1] That became worse when the COVID-19 pandemic began.

Trial Court Memorandum and Order ("TCO") at 1-2. Mother prevented Father from seeing Child after he moved out of her home, and on June 1, 2020, Father filed a custody complaint. On June 11, 2020, Mother filed a Protection from Abuse ("PFA") petition alleging that on three separate instances Father had physically abused Child. As the trial court explained:

The PFA matter came before a former judge of the Greene County court who had in place a process he used in this case. Eventually, the judge interviewed [Child] in chambers. We are unclear from the PFA record if counsel was present for that interview. In any event the judge just entered an order in the PFA excluding Father from having any contact with [Child] and ordering [ ] Father to have an anger assessment and treatment as well as requiring the parties to engage in family counseling. This may have been done with Father's consent since he did not believe he had an anger problem but clearly wanted to see his daughter. The temporary order was then to be addressed in 6 months which later became 8 or 9 months. Unfortunately, following the process used by the former judge this case did not come to an evidentiary hearing until March of 2021 when that judge had retired or resigned from the bench and we moved this matter to a hearing so a decision could be made on the long continued PFA and therefore also the stalled custody matter could progress. After a hearing regarding the PFA we concluded that there was no merit to the PFA and it was dismissed.

---

[1] The trial court found credible Father's testimony regarding the various cleaning rituals upon which Mother insisted. Because she believed that the bathroom was unsanitary, Mother insisted that Child use a child training potty kept in Child's bedroom, which Father was required to empty; an additional training potty was kept in Father's truck, for use whenever the Child was out of the house, as Mother also did not believe Child should use a public bathroom, nor was Child permitted to use a bathroom at any of their relatives' homes. *See* N.T., 4/15/21, at 32-34.

- 2 -

TCO at 2-3.

A trial was held over five days, on April 14, 15, and 16, and September 15 and 16 of 2021. Due to limited staff in the county, and delays in payment for the transcript, approximately five months passed prior to the date the parties' briefs were due and filed. The court issued its order in March 2022, granting shared legal custody and shared physical custody on a weekly basis; however, the order set forth a schedule of limited, transitional visitations for Father with Child prior to the commencement of fully shared custody, beginning with a one-hour visit to occur immediately following the third session of ongoing family reunification counseling sessions, and specifying that one additional hour was to be added to each successive visit, to occur after each of the next three reunification sessions, followed by three successive weeks of 9 a.m to 4 p.m. Saturdays visits. Custody Order at 2. The court ordered that Child, who was being home-schooled by Mother, should be enrolled in public school, unless a continuation of the home school arrangement was agreed upon by Father. *Id*. Mother filed a timely appeal and statement of matters complained of on appeal on March 29, 2022.

Mother raises the following issues, reordered for ease of discussion:

> 1. Did the trial court err as a matter of law and abuse its discretion in ordering that the parties exercise shared legal and physical custody of their minor child, instead of granting [Mother] sole or primary physical custody, and sole legal custody, where the court's findings are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

2. Did the trial court err as a matter of law and abuse its discretion in finding that the 23 Pa.C.S. § 5328(1), (8), (9), (10), (13), (15), and (16) statutory best interest factors favor the Father [ ], instead of favoring the Mother [ ], where the [c]ourt's findings are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

3. Did the trial court err as a matter of law and abuse its discretion in finding "that this child should be primarily in the custody of the Father…Accomplishing that at this point has been made impossible by the actions of Mother and the Court system" where the [c]ourt's findings are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

4. Did the trial court err as a matter of law and abuse its discretion in disregarding the child's well-reasoned and mature preferences regarding her Father, by finding that "[t]his child is very mature but her preference is not well-reasoned.  Essentially, she indicates Father was mean and she is afraid of him and wants nothing to do with him," where the [c]ourt's findings, except that "the child is very mature," are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

5.  Did the trial court err as a matter of law and abuse its discretion in its findings denigrating the child's Mother [ ], and in blaming her for the child's poor relationship with her Father, where [Mother] was acting in accordance with her legal and moral obligation to protect her daughter's welfare in light of the Father's concerning history, where the [c]ourt's findings are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

6. Did the trial court err as a matter of law and abuse its discretion in relying on the report and testimony of Dr. Michael Crabtree, and in disregarding the testimony of Dr. Bruce Chambers, when the trial evidence established that Dr. Crabtree's evaluation was not performed in accordance with the applicable professional standards and guidelines for the type of evaluation he performed, where the [c]ourt's findings endorsing Dr. Crabtree's testimony and opinions are not supported by competent evidence of record

and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

7. Did the trial court err as a matter of law and abuse its discretion in relying on the reports and testimonies of therapists Jonathan Johnson and Rebecca Mitchell, when the trial evidence established that their involvement and services in the case were not performed in accordance with the applicable professional standards and guidelines for the type of services they performed, and/or violated controlling ethical standards for their profession, where the [c]ourt's reliance on their testimony is not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

8. Did the trial court err as a matter of law and abuse its discretion in disregarding the testimony of Dr. Scott Tracy, when the trial evidence established that Dr. Tracy's opinions and testimony were competent and reliable, where the [c]ourt's findings disregarding Dr. Tracy's testimony and opinions are not supported by competent evidence of record are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

9. Did the trial court err as a matter of law and abuse its discretion in disregarding the testimonies of Angela Stoneking and Rebekah Rockwell, which amply supported Mother's [ ] concerns about the parties' daughter's welfare vis-à-vis Father's [ ] behavior, as well as the child's own in-chambers concerns and fears about her Father's conduct, where the Court's findings disregarding their testimony are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

10. Did the trial court err as a matter of law and abuse its discretion in relying on the discredited and inadmissible "parental alienation" theory for the child's problematic relationship with her Father, where the [c]ourt's findings are not supported by competent evidence of record and are contrary to the child custody best interest factors set for in 23 Pa.C.S. § 5328?

11. Did the trial court err as a matter of law and abuse its discretion in ordering and attempting the dictates the terms of a controversial and troubled "reunification program" for the child and her Father, and in unreasonably and inappropriately placing full responsibility for the program's "success" or "failure" on

Mother [ ], where the [c]ourt's findings are not supported by competent evidence of record and are contrary to the child custody best interest factors set forth in 23 Pa.C.S. § 5328?

Mother's Brief at 10-14 (suggested answers omitted).

In custody cases, our standard of review is as follows:

In reviewing a custody order, our scope of review is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Mother argues, in her first issue, that the court erred in granting shared legal and physical custody, generally, by making findings unsupported by competent evidence and contrary to the child custody best interest factors set forth in Section 5328(a) of the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340; in her second issue she asserts, specifically, that the court erred in finding that the best interest factors set forth in subsections (1), (8), (9), (10), (13), (15), and (16) favored Father. Mother's Brief at 10-11.

In any custody action under the Act, the paramount concern is the best interest of the child. *See* 23 Pa.C.S. §§ 5328, 5338. Section 5328(a) provides:

(a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

     (11)   The proximity of the residences of the parties.

     (12)   Each party's availability to care for the child or ability to make appropriate child-care arrangements.

     (13)   The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

     (14)   The history of drug or alcohol abuse of a party or member of a party's household.

     (15)   The mental and physical condition of a party or member of a party's household.

     (16)   Any other relevant factor.

23 Pa.C.S. § 5328(a).

With regard to the first best interest factor, i.e., which party is more likely to encourage and permit frequent and continuing contact between the child and the other party, we note initially that Mother has steadfastly maintained that Child has been emotionally and physically abused by Father, and that it is her legal and moral obligation to prevent contact between them. Mother argues that the trial court erred by unduly emphasizing the notion that Father supports Child's relationship with Mother, and wrongly deems Mother's protective stance opposing Father's custody to be "a bad thing." Mother's Brief at 19-20. Mother quotes from academic literature regarding the "friendly parent concept" and the protection of children from domestic violence to buttress her argument that the trial court's assessment is incorrect and fails

to recognize that Mother cannot foster contact between Father and Child because she believes that he is an abuser.

Here, the trial court found that "because of her unreasonable belief that Father is a danger to [Child,] Mother has done everything (including we conclude sharing her feelings with [Child] and causing [Child] to have extraordinary negative feelings for [Father] not consistent with the facts of this case) to keep [ ] Father from seeing [Child]…" TCO at 4. The lengthy record supports the trial court's conclusion that there was neither physical abuse, by Father, nor emotional abuse, by either parent, but "just poor parenting." *See id*. at 5.

The trial court described Mother's account of Father's abusive conduct toward Child:

> Mother suggests that [Child] was physically and emotionally abused by Father. Mother is adamant about the physical abuse and clearly upset that more than one expert has not seen the issue that way.[2] The alleged physical abuse consisted of three things that were considered by this [c]ourt during the PFA hearing. First Mother notes the Father threw a computer tablet in the direction of [Child] which did not strike her. He may have done that on more than one occasion. Next she alleges apparently while brushing or braiding [Child's] hair [Child] said he pushed or hit her in her back but there was no mark and no medical attention required. Finally while [ ] Father and [Child] were playing with nerf swords [Father] threw a nerf sword at her and struck [Child] once in the chest again with no mark or medical attention required.

---

[2] The record reveals that Mother's abuse complaint to Greene County Children and Youth Services ("CYS") was investigated and determined to have been unfounded and the case closed; the trial court noted that CYS indicated that Child was being coached by Mother. TCO at 6.

*Id*. at 4. The trial court found that Child was exposed to frequent arguments and name calling in a dysfunctional home where the atmosphere was "awful" to endure, but that it constituted neither physical nor emotional abuse. *Id*. at 5, 8. With regard to the actions of Father, the court described the dynamic wherein Child frequently would refuse to eat at dinnertime, and Father, who prepared all of the meals, and Child would go from playing together to a sudden explosion into unpleasant exchanges; the court found significant that post-separation, Father recognized this behavior was not appropriate and sought anger management counseling to learn how to better address such issues. *Id*. Mother, conversely, continued to share her negative feelings for Father with Child, including permitting Child to listen to Mother's virtual therapy sessions, and caused Child's perception of Father to be "detrimentally distorted and tainted." *Id*. We discern no abuse of discretion in the trial court's decision to weigh this factor clearly in favor of Father.

Mother challenges the court's determination that best interest factors (8) and (13) favor Father; however, the trial court reasoned that while there is no evidence that Father has attempted to turn Child against Mother, there is clear evidence from several sources, including from Mother herself, that she does not want Child to have any type of relationship with Father. *Id*. at 9. The trial court made clear that, *sub judice*, there has been no domestic violence that requires Mother to protect Child against Father and would justify any attempt on her part to employ safety measures to protect Child from harm. The court also found, as to best interest factor (9), that Father was

more likely to maintain a nurturing relationship with Child adequate for her emotional needs, deeming Mother's negative feelings for Father to have been transferred from Mother to Child in a manner that is neither nurturing nor healthy for Child. *Id*. The court noted that, regarding the level of conflict and willingness to cooperate, "Mother has raised the level of conflict based on her false conclusion that [Child] has been and will be abused by Father. In the meantime[,] Father just wants to spend time with his daughter and give[s] every indication he will cooperate with Mother for the sake of [Child]." *Id*. at 11.

The trial court considered which party was the more likely party to attend to Child's daily physical, emotional, developmental, educational and special needs, i.e., best interest factor (10), and found in Father's favor. The testimony establishes that up until the time Father left the home, he worked full-time shifts for a mining company, and performed all of the grocery shopping and cooking for the family, bathed Child and got her ready for bed, while Mother paid the bills and assumed the duties of home-schooling Child. The court recognized that Mother did an excellent job home-schooling Child and clearly loves and has provided a stable environment for her; nevertheless, it expressed its belief that, based on Father's attitude as expressed during the lengthy custody hearings and the experts with whom he has been in contact, if granted custody he would build a more nurturing relationship with Child and help remove the stress caused by her subjection to Mother's negative feeling toward him and overall better help to stabilize Child. *Id*. at 10. After careful

review, we discern no abuse of discretion in the trial court's findings and reasoning with regard to best interest factors (8), (9), (10), and (13).

Mother also challenges the court's determination that best interest factor (15), regarding the mental and physical condition of the parties, slightly favors Father. *Id*. at 11. Mother's brief includes no actual argument regarding this issue; we note that the trial court stated, and the trial testimony supports the fact that Father has no known mental or physical condition, and that Mother suffers from a serious bladder problem that has in the past effected her ability to care for Child in the morning and evening. *Id*. The trial court further noted that Mother had previously been diagnosed with depression and anxiety. *Id*.

Mother's third and fifth issues are interrelated: she challenges the trial court's initial comments regarding the appropriate custody determination and asserts that the court both denigrated Mother and blamed her for Child's poor relationship with Father. We find no merit in either issue, and cite the court's comment to provide appropriate context:

> While each custody case is unique this case at first glance should not be particularly difficult to decide. Unfortunately, after five days of testimony ([4/14/21, 4/15/21, 4/16/21, 9/15/21] and ending with the troubling testimony of [Child] on September 16, 2021) including input from several experts this has become the most troubling custody case the undersigned has considered in over 30 years on the bench. We say that because the easy answer after consideration of the necessary factors is that [Child] should be primarily in the custody of [ ] Father. Accomplishing that at this point has been made impossible by the actions of Mother and the Court system.

TCO at 1. The trial court makes clear that although both parents are to blame for the dysfunctional home, Mother "has undermined the counseling process whether it be family counseling or reconciliation counseling when matters have not gone her way." *Id*. at 4. The trial court's comments were both appropriate and fully consistent with the record.

In her fourth issue, Mother argues that the court erred in disregarding Child's "well-reasoned and mature" preference to remain in Mother's custody. Mother Brief at 22. At the final hearing, Child, who was then eight-years old, testified, initially declining to provide her last name, because she did not "even like saying it;" she testified that while she liked to play games with Mother, there was nothing she liked to do with Father because "he was mean" and "he yells at me" and "calls me names." N.T., 9/16/21, at 11. She stated that the names Father called her included "a big baby," "a cry baby," "Momma's little robot," "ramrod," and "a liar." *Id*. at 13. When questioned as to whether he had ever put his hands on her in a way that hurt her, Child responded that "one time, he hit me in the back," explaining that Father was getting ready to pull up her long hair in hairclips because it was time to eat, and she wouldn't let him. *Id*. at 15-16. On another occasion, she stated, she "asked him to help [her] look for a string and he got mad and quit looking – and then he got [her] by [her] wrist and was trying to pull me." *Id*. at 16-17. She recounted the instance when Father threw a toy at her, explaining "I told him I would eat after he lightly tapped me with the [Nerf] sword ten times, and he thought I said two [times]. And then, he quit and then I said ten, and then he got

- 13 -

mad and when he went to walk away, he threw the Nerf sword right at me." *Id*. at 17-18. She stated that he had thrown a computer tablet at her four or five times – on two of those occasions, she reported, he got mad and "threw [the tablet] on the couch, and it bounced – or he threw it and then it was about to land on [her] feet, and [she] had to back up." *Id*. at 19-20. She stated that it makes her feel really scared when she has to see Father in family reunification therapy because she is "afraid that he's going to hurt me worse than he already did." *Id.* at 21. When asked, she denied that she and Father had ever played with specifically named toys and/or performed any of a long list of very specifically described activities, including playing with her 'Barbie' collection, making paper airplanes, planting a pumpkin patch, making up and singing specific songs, waving to him at the window while he cut the grass, parading with muffins around the kitchen island, and playing air guitar.[3] *Id*. at 23-38.

The court stated:

_____

[3] Conversely, Father testified that he and Child played every day. He stated that they played specific computer games (Hangman, June's Journey, Sonic) on her tablet and further stated in great detail:

> We would play the Nintendo Wii U, we would play boardgames, we would play chase, we would play dungeon, we would play Simon Says, we would play I Spy. The little game I Spy she came up with, it's a variant of that. Sing theme songs from her cartoons together. Whatever she [wanted] – Barbies, monster trucks, dinosaurs, all kinds of stuff.

N.T., 9/15/21, at 64.

Essentially[, Child] indicates Father was mean and she is afraid of him and wants nothing to do with him. While there was expert testimony that a child can reach conclusions such as that without input from a parent or anyone else in this case her preference mirrors Mother's preference and we conclude has been tainted by Mother upon considering all the evidence…there were also happy times even admitted by Mother where [Child] and Father played together and laughed together…When we talked to [Child] in chambers she indicated she could remember no happy times with Father. The facts just don't support that.

TCO at 8. We find no error in the court's conclusion that while Child is very mature, her preference is not well-reasoned.

In her sixth and seventh issues, Mother asserts that the court erred or abused its discretion in relying on the report and testimony of Dr. Michael Crabtree, the psychologist designated by the court and approved by the parties to perform a custody evaluation, as well as the reports and testimonies of therapists Jonathan Johnson and Rebecca Mitchell, and in disregarding the testimony of Dr. Bruce Chambers, who was retained by Mother to dispute Dr. Crabtree's conclusions. Mother's Brief at 25-26. As the trial court noted, Dr. Chambers' chief objection to the report and testimony of Dr. Crabtree, who recommended equally shared legal and physical custody and suggested continued work with the family reconciliation therapist with gradual increases in physical custody over three months, was that he failed to personally interview Child and instead assigned that task to his assistant. In so doing, Mother asserts, and Dr. Chambers agreed, that Dr. Crabtree violated professional standards and guidelines of the American Psychological

- 15 -

Association for child custody evaluations; Dr. Crabtree vehemently denied such violations.

After careful review of the reports and testimonies of Drs. Crabtree and Chambers, we find that the trial court did not err in its reliance upon the testimony and report of Dr. Crabtree. Dr. Crabtree testified extensively about the interviews conducted in the course of preparing his evaluation, and fully explained the considerations, both ethical and practical, taken into account when determining whether to interview a child. See N.T., 4/14/21, at 24-29, 151-158.

Ms. Mitchell is a therapist who was originally retained to provide reunification services and to help Father with parenting skills; Ms. Mitchell met once with Father, and two days later, with Mother, for intake sessions. However, after Mother learned from Ms. Mitchell that Ms. Mitchell would make the determination as when Child would meet with Father – and that Child would not have the ultimate say on when that meeting might occur – Mother discontinued the relationship, while Father continued on with counseling sessions for himself only. Mr. Johnson is a licensed clinical social worker and therapist who was contacted by Mother to replace Ms. Mitchell as a reunification counselor; he served in that capacity from August 2020 through the time of the hearing. Mr. Johnson testified that he met with Child and Father alone together for the first time in October 2020 for approximately five minutes, but that Child was resistant; the meetings have progressed over time to twenty-five minutes. N.T., 4/15/21, at 63-64. Mr. Johnson testified that

both Mother and Child have expressed to him that he has broken their trust by continuing to advocate for the continuation of a relationship between Child and Father. ***Id***. at 68.

We find no merit in Mother's sixth and seventh issues. The trial court was charged with weighing the evidence and determining the credibility of witnesses, whom it had the benefit of observing and assessing first-hand. ***See C.R.F.*** The court made clear that it considered all of the evidence presented by Mother, and it was free to discredit Mother's witnesses or find those of Father more persuasive. We discern no abuse of discretion in the trial court's weighing of the evidence in these matters.

Similarly, Mother's eighth and ninth issues challenge the court's determinations with regard to the testimony of Dr. Scott Tracy, Angela Stoneking, and Rebecca Rothwell. Mother's Brief at 27-28. Again, we find no merit to these arguments. Ms. Stoneking and Ms. Rockwell are, respectively, a neighbor and cousin of Mother; each testified to incidents when they heard shouting and fighting, between Mother and Father and between Father and Child; neither activity is disputed by the parties. Dr. Tracy, who was retained by Mother, is a licensed professional counselor with a clinical specialization in trauma. He testified that Child showed indicators of post-traumatic stress from an "adverse childhood experience," or "ACE," and specifically from parental conflict. N.T., 4/15/21, at 126. Dr. Crabtree, who is also experienced in the field of trauma, did not believe that Child had experienced trauma in the way the term is used in the professional field, but rather opined that he

found evidence of anxiety. *Id*. at 26. Dr. Tracy did not interview Father but, as noted by the trial court, he:

> attributed [Child's] PTSD to the trauma caused by those actions of [Father]. Thus he indicated when [Child] is in the presence of Father she has anxiety. He opined that to ignore the anxieties [Child] was experiencing would be devastating. He did not offer an opinion that [Child] should not have [Father] in her life.

TCO at 14.

Mother asserts, in her tenth issue, that the court improperly relied upon a discredited and inadmissible "parental alienation" theory to explain Child's problematic relationship with Father. Mother's Brief at 29. Dr. Crabtree specifically addressed Mother's averment regarding his supposed misuse of the discredited concept, "parental alienation syndrome," explaining that he was not using that term; he summarized his findings, noting:

> I'm talking about the pattern that I saw within the unique context of this evaluation whereby [Mother] has gone – has complained to CYS, has had four other individuals [other therapists, to whom she reported abuse by Father] complain to CYS, filed a PFA against Father, has initiated therapy in multiple instances and terminated therapy when people are not cooperative, or they want [Father] to be involved. All designed according to her statement whereby she needs to be one hundred percent the parent. Those are all the things I'm talking about when I use the term alienation.

N.T., 4/14/21, at 130. Upon thorough examination of the testimony, it is clear that Mother's assertion that Dr. Crabtree employed a discredited concept lacks merit; indeed, the trial court noted that Dr. Chambers himself acknowledged that while there is no longer a medical diagnosis of "parental alienation

syndrome," there can still be a pattern of behavior by a parent designed to alienate a child at Child's age level. *See* TCO at 13.

Finally, Mother asserts that the trial court erred in dictating the terms of the family's reunification therapy and for placing responsibility for the success of that therapy on Mother. We disagree. In its order, the trial court makes clear that the onus is on both parents; the order contains the following paragraph, the only paragraph set forth in capital letters and bold print:

> **17. NEITHER PARENT SHALL SAY OR DO ANYTHING IN AN ATTEMPT TO TURN THIS CHILD AGAINST THE OTHER PARENT, NOR SHALL EITHER PARENT PERMIT OTHERS TO DO SO; BUT RATHER EACH PARENT SHALL DO EVERYTHING IN THEIR POWER TO PROMOTE A FAVORABLE AND LOVING ATTITUDE ON THE PART OF THE CHILD TOWARD BOTH PARENTS.**

Custody Order at 6. In its opinion, the trial quoted with approval the testimony of Dr. Tracy with regard to the importance of family therapy, and noted Dr. Tracy's response to the question of who has the most responsibility to fix the problems in this family, wherein Dr. Tracy indicated that all three members of the family must learn how to cooperate. *See* TCO at 15-16.

After careful review of the record, we are satisfied that the trial court properly analyzed all of the relevant factors enumerated in Section 5328(a) of the Act. We find no abuse of discretion in the trial court's determination to award shared legal and physical custody of Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/25/2022